**FILED**
**JULY 24, 2018**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III



IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35111-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| EMANUEL HUBBART, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Emanuel Hubbart raises the unique argument that a trial exhibit

constitutes an impermissible judicial comment on the evidence and a common argument

that the prosecution engaged in misconduct. We reject his arguments and affirm, on

appeal, his convictions for rape and molestation of his stepdaughter.

## FACTS

In February 1993, Dawn and Emanuel Hubbart wed. Dawn bore three children

from a previous relationship, including daughters Kathy, born October 26, 1988, and

Bertha, born on an unidentified later date. Although both daughters allege that Hubbart

sexual molested them, the prosecution only concerns acts directed at Kathy. Kathy and

Bertha are pseudonyms.

From 1996 until 2003, Emanuel Hubbart sexually abused his stepdaughter Kathy. During trial testimony, Kathy described a number of attacks, although she could not date the attacks nor give detailed descriptions of some of the attacks, since the attacks occurred as often as four times per week. Hubbart first directed Kathy and Bertha to masturbate him while Dawn Hubbart was at work. Bertha was as young as four during these occurrences.

On a later occasion, Emanuel Hubbart attempted to penetrate Kathy's vagina with his penis until she stopped him. On other dates, Hubbart forced Kathy to digitally copulate him. He often touched Kathy on her breasts and buttocks.

Sometime in 2003, Dawn and Emanuel Hubbart argued over when fourteen-year-old Kathy should retire for bed. The disagreement escalated and Hubbart hit Dawn in the face, which punch broke her jaw. Kathy waited with her mother in the hospital until Kathy's grandfather instructed Kathy to return home. On the return home, Hubbart attacked Kathy for the last time. During trial, Kathy described the attack:

> I just remember it being in the afternoon after I had woke [sic] up because I was up late, and all I can remember is just when it happened. I don't really remember prior to, but I just remember him pinning me down and like forced himself on me and pried my legs open. All the while I was just saying like, "Stop. No." Crying.
> He told me if I didn't stop crying that he would hit me. Then he had sex with me, and I just remember just looking at the clock just thinking, "Can my sister hurry up and come home and save me."

2

Report of Proceedings (RP) at 174. Following the sexual assault, Kathy wiped her vaginal area with a sanitary napkin, which she fortuitously stored in her dresser drawer.

Emanuel Hubbart's attack on Dawn led to Kathy's disclosing to her mother of Hubbart's abuse. On August 25, 2003, Kathy and Dawn Hubbart visited Todd Dronen of the Kennewick Police Department to report the abuse. On August 29, Kathy and Dawn delivered to the police the sanitary napkin Kathy used to clean herself. An examination revealed Hubbart's and Kathy's deoxyribonucleic acid (DNA) on the sanitary napkin.

In October 2003, the State of Washington charged Emanuel Hubbart with rape of a child in the third degree. On November 7, 2003, the trial court released Hubbart on his own recognizance. Hubbart signed a court order establishing conditions of pretrial release, wherein Hubbart listed a South Stewart Street, Kennewick, address. No such street exists in the city of Kennewick. The order banned Hubbart from contacting Dawn and her two daughters. The order listed Kathy's birthdate as October 26, 1988.

In part because of the fictitious address for Emanuel Hubbart's home, Kennewick Police Officer Craig Hanson could not locate Hubbart weeks after his release. Officer Hanson later received a tip that Hubbart lived in Kent, and Officer Hanson attempted to locate him in the Seattle suburb. In early 2004, the Kent Police Department discovered Kathy and Bertha residing with Emanuel and Dawn Hubbart in a Kent domicile. On February 4, 2004, the State returned Hubbart to the trial court, and the court reset bail.

On February 24, 2004, Dawn Hubbart wrote a letter to Emanuel Hubbart's defense

attorney, which read in pertinent part:

> I really need to talk to you concerning my husband's case, Emanuel
> Hubbart.  I have very crucial information to help you on your case to
> defend him.  He has been falsely accused.
> My daughter and her biological father have conjured all of this up.  I
> have written statements from my other daughter with info, and she wants to
> go before the judge and tell what really was said.  Plus, my written
> statement also.

RP at 160.  On March 25, 2004, Dawn penned another letter to the attorney, which

second letter read:

> Around the end of February [Kathy] called our house and was
> talking with [Bertha].  I was on the other phone listening, and [Kathy]
> wanted to make sure that [Bertha] was still going to 'stick to the story'
> about Emanuel touching her when we went to trial.
> [Bertha] told [Kathy] that she was not gonna['] lie anymore and tell
> the judge the truth that none of this ever happened.  I was in shock and flew
> off the handle and said, 'How could she make up such a horrific lie?'
> I was disgusted because I am the one who pressed charges in the first
> place.

RP at 162.  Bertha also wrote a letter to Hubbart's defense attorney explaining that she

fabricated the claims against Hubbart in order to protect her mother.

On August 30, 2004, the State dismissed the charges against Emanuel Hubbart

without prejudice.  The State wrote in the dismissal: "[t]he victim in this case has

evidently moved to the Las Vegas area and this office is unable to contact [her] at this

time."  Ex. 7.

Following the dismissal of the original charges, Dawn Hubbart continued to reside

4

with Emanuel Hubbart despite his domestic violence and Kathy's claims of sexual abuse.

During trial testimony, Dawn explained her behavior:

> When all of this came about and [Kathy] told me everything and, um, at the time I had been havin' extreme—I mean, I'd been havin' so many problems with [Kathy], um, at the time, you know, before she told me about the assault. I just figured it was a teenager just the way they are. I had no idea that it was actually because of this.
>
> Now I understand why, but at the time I didn't understand, and when she was with her Dad, um, she was talkin' about [Bertha] and I had picked—I don't know what I did. I don't know if I answered the phone or if I didn't know they were on the phone but I overheard [Kathy] telling—
>
> . . . .
>
> A. I didn't believe it. I didn't believe it because of the circumstances. So, I went back.

RP at 145-46. During trial, Dawn additionally illuminated that she also suffered from domestic violence in her first marriage. She noted difficulty in leaving Hubbart because he accepted her children.

In June 2015, the biological father of Bertha and Kathy called Kennewick Police Detective Randy Maynard and asked about the police investigation of Emanuel Hubbart. Detective Maynard subsequently contacted Bertha and Kathy to discuss Hubbart.

PROCEDURE

On January 26, 2017, the State of Washington brought a renewed prosecution. The State charged Emanuel Hubbart with rape of a child in the first degree, child molestation in the first degree, rape of a child in the second degree, rape of a child in the third degree, and child molestation in the third degree. In each count, the State identified

5

Kathy as the victim.

Before reception of trial testimony, Emanuel Hubbart moved in limine to prevent the State from admitting as an exhibit any court records from the State's initial prosecution of Hubbart in 2003, which case the State dismissed. In response, the State asked permission to introduce as an exhibit the November 7, 2003, order that listed conditions for Hubbart's pretrial release. The State sought admission of the court order to show the jury that Hubbart provided a false address for his home and that the order prohibited Hubbart from contact with Dawn Hubbart and her two daughters. The State deemed the exhibit relevant because Hubbart violated the court order by residing with Dawn and her daughters, including the victim in the prosecution. This violation of the order permitted Hubbart to influence Dawn to write a letter seeking dismissal of charges and to manipulate Bertha to retract her allegations of abuse. In turn, the violation of the order explained the delay in prosecuting Hubbart.

In reply, Emanuel Hubbart argued that the order of release conditions lacked any relevance to the charges. The trial court agreed to admit the exhibit because the order and its violation substantiated the coercion that Hubbart imposed on his wife and her daughter and the false address substantiated his desire to avoid detection of his contact with the women.

During its opening statement, the State presented a slideshow to the jury. The first slide included a title, which read: "20 year search for justice." Clerk's Papers at 90.

Emanuel Hubbart did not testify during his trial. His defense posited that Kathy and Bertha fabricated their allegations in order to live with their natural father. Bertha testified at trial that she lied in her letter to Hubbart's initial defense counsel about fabricating the allegations because she was young and her mother pressured her to lie. Bertha averred regarding her letter:

> So, I did lie, but, I mean, I did what I was told. I was a kid, and I just did what they told me to do because, I mean, this has been goin' on for so long. It was very scary, and so we did what we were told for a long time until we got away.
> Q. Who was telling you to lie?
> A. My mom, and I think—I'm sure D told her to lie, you know. Those were serious charges, and, I mean, how I would know to address it to whoever—I don't even know who that guy is, you know? How would I know who to address it to? I just did what I was told.

RP at 198.

Dawn Hubbart also testified that she lied in her letter to the first defense counsel because Emanuel Hubbart frightened her. Dawn declared that Hubbart's physical abuse caused her to posit excuses for his actions and blame his violence on herself. Dawn testified:

> and you have to understand that even if he was in jail I was still scared and if—if I did—you know, I knew if I would, you know, more things were to get—it would just cause more problems, you know? When you're in a relationship like that I don't know what it is, I don't know why, but you just continue to make excuses all the time.
> I just didn't want charges pressed and I didn't want him to be in jail because I thought, you know, it was all my fault and he didn't, you know, just—yeah.

7

RP at 144.

Kathy testified extensively at trial. She had by then reached the age of twenty-eight.

During closing argument, the prosecution addressed Emanuel Hubbart's theory that Kathy fabricated the allegations of rape and abuse. The prosecution remarked:

> I would like you to think of these facts or these factors in considering what the evidence is in this case—what the actual facts are in the case. First of all, I'd like you to consider [Kathy], and I would like you to consider her motive to come to court yesterday and testify.
>
> Remember, she hasn't had any contact with the gentleman seated at counsel table for over six years. Remember the defense—the theory of the defense is that, well, these two girls plotted. They wanted their stepfather out of the picture because he was beating up their mom, and therefore, they came up with this story about sexual abuse.
>
> . . . [Kathy] doesn't have any contact with the defendant, and frankly she doesn't have any contact with her mother. There's no motive. None. Zero motive for [Kathy] to tell you anything other than what's actually happened. . . .
>
> . . . .
>
> It wasn't [Kathy]. Detective Maynard was the one that went out and talked to [Bertha] and [Kathy]. It wasn't [Kathy] calling up and saying, "I want this case reinvestigated."
>
> [Kathy] doesn't have any motive at this point other than to just tell you the truth. Also consider, you know, the factors here are really compelling. We know that [Kathy] is telling the truth about the starting point, about the very first episode that this happened, which was in Federal Way or Seattle where the defendant got both girls onto the bed and you heard their descriptions of it.
>
> We know that [Bertha] confirmed that absolutely. So, we know the starting date. . . .
>
> . . . .
>
> I would suggest to you without any doubt that [Kathy's] testimony is accurate, you know, at least about the start and about the finish.
>
> We also know that [Bertha] saw the defendant and [Kathy] having

oral sex. You heard [Bertha's] testimony about that. You heard [Kathy's] testimony. We also know concerning [Kathy] that she's been consistent. Here she's been interviewed forensically—by a forensic interviewer. She's been interviewed by a police officer. She's been interviewed by Doctor Zirkle. She's been interviewed by the defense attorney. You haven't heard any inconsistencies in those interviews.

. . . .

I'd also ask you to consider the fact that he [Emanuel Hubbart] coerced statements from [Bertha] and Dawn. Let's go over a couple things. [Bertha]—[Bertha] has no motive to lie in this case, and really, you know, one thing the judge has told you in assessing the credibility of witnesses you can look at their demeanor on the witness stand, and frankly, how could you not believe [Bertha]?

I'll leave it at that. I'll just leave it at that. How could you not believe her with the way she testified? The sincerity and the tearfulness about, you know, the fact that she lied [in 2003]. That really got to her. She was just 14. That's just not realistic to think that she wrote the letter that's been admitted just on her own.

RP at 322-26.

The prosecution further argued:

When we were doing jury selection we talked about the wish list. What could you possibly expect to have in a case like this. . . .

. . . .

We've got an independent witness. We've got [Bertha] who actually saw, actually saw the sexual contact, the oral sex between the defendant and [Kathy]. We've got consistent statements going back 20 years. You know, if [Kathy] were not telling the truth, she'd be tripped up somewhere along the line.

RP at 335.

The prosecution added in summation:

I would submit to you that if [Kathy] made all this up in 2003 when she was a teenager, when she was mad, when she was upset, when she was just—couldn't believe that her mom was siding with her abuser, if that was

9

her motive then and she lied about it all, well guess what? She's got 15 years behind her. She's got a new life.

If it was all a lie, as an adult she could have said, "No, I don't want to cooperate. Please, let's let sleeping dogs lie." That's not what she did. Kennewick police got in touch with her, and they said, "This is still viable. We have DNA evidence. Do you want to cooperate? Do you want to come to trial? Do you want to face the man that did this to you?" And she said, "Yes."

She got on that stand, and it was not easy for her to do that. As an adult she has a completely different mind-set and arguably no motive, if she ever had a motive, no motive whatsoever in 2017 to take the stand. If it was all a lie in 2003, you could—could you decide that there was no way she would subject herself to getting on the stand and retelling all these lies when there's no reason to do so?

She's escaped him. She's gotten away from him. What's the point other than justice? Other than a search for truth? So, is it ideal that this case is coming to light in 2017? No, not at all, but that is the reality.

RP at 342-43.

The prosecution finished with its summation rebuttal:

They [the defense] can't get around that. They want to pin that on anyone other than Emanuel Hubbart. There's no motives here except for a search for the truth that frankly was way too long in coming, but [Kathy] has finally had her day in court. This is the evidence. This is the evidence that you have now to consider, and based on that evidence we would ask that you return verdicts of guilty on all counts.

RP at 350.

The jury convicted Emanuel Hubbart on all five counts.

LAW AND ANALYSIS

Judicial Comment on Evidence

Emanuel Hubbart claims the trial court erred by admitting exhibit 6, the order in the 2003 prosecution that established conditions of pretrial release, because the exhibit included Kathy's date of birth as October 26, 1988. Hubbart argues that admission of the exhibit, with its identification of the birthdate, constituted an impermissible comment on the evidence by the trial judge.

The State observes that, at trial, Emanuel Hubbart objected to exhibit 6 on relevance grounds, but not as presenting a judicial comment on the evidence. Thus, the State argues that Hubbart did not preserve this first assignment of error. We agree that, under the general rule, the reviewing court will not entertain an assignment of error based on an evidentiary objection unless the appellant informed the trial court of the correct basis on which to exclude evidence. *Marr v. Cook*, 51 Wn.2d 338, 341-42, 318 P.2d 613 (1957).

Under RAP 2.5(a), this court may refuse to review any claim of error not raised in the trial court. A constitutional right, or a right of any other sort, may be forfeited in criminal cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it. *United States v. Olano*, 507 U.S. 725, 731, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993). Good sense lies behind the requirement that arguments be first asserted at trial. The prerequisite affords the trial court an opportunity to rule correctly

on a matter before it can be presented on appeal. *State v. Strine*, 176 Wn.2d 742, 749, 293 P.3d 1177 (2013). There is great potential for abuse when a party does not raise an issue below because a party so situated could simply lie back, not allowing the trial court to avoid the potential prejudice, gamble on the verdict, and then seek a new trial on appeal. *State v. Weber*, 159 Wn.2d 252, 271-72, 149 P.3d 646 (2006); *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012). The theory of preservation by timely objection also addresses several other concerns. The rule serves the goal of judicial economy by enabling trial courts to correct mistakes and thereby obviate the needless expense of appellate review and further trials, facilitates appellate review by ensuring that a complete record of the issues will be available, and prevents adversarial unfairness by ensuring that the prevailing party is not deprived of victory by claimed errors that he had no opportunity to address. *State v. Strine*, 176 Wn.2d at 749-50; *State v. Scott*, 110 Wn.2d 682, 685-86, 757 P.2d 492 (1988).

Countervailing policies support allowing an argument to be raised for the first time on appeal. For this reason, RAP 2.5(a) contains a number of exceptions. RAP 2.5(a) allows an appellant to raise for the first time "manifest error affecting a constitutional right," an exception upon which a criminal appellant commonly relies. Constitutional errors are treated specially under RAP 2.5(a) because they often result in serious injustice to the accused and may adversely affect public perceptions of the fairness and integrity of judicial proceedings. *State v. Scott*, 110 Wn.2d at 686-87.

Washington courts and even decisions internally have announced differing formulations for "manifest error." First, a manifest error is one "truly of constitutional magnitude." *State v. Scott*, 110 Wn.2d at 688. Second, perhaps perverting the term "manifest," some decisions emphasize prejudice, not obviousness. The defendant must identify a constitutional error and show how, in the context of the trial, the alleged error actually affected the defendant's rights. It is this showing of actual prejudice that makes the error "manifest," allowing appellate review. *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009); *State v. Scott*, 110 Wn.2d at 688. A third formulation is the facts necessary to adjudicate the claimed error must be in the record on appeal. *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995); *State v. Riley*, 121 Wn.2d 22, 31, 846 P.2d 1365 (1993).

In forwarding his appeal, Emanuel Hubbart asserts a provision in the Washington Constitution. Article IV, section 16 of the Washington Constitution provides: "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." The purpose of article IV, section 16 is to prevent the jury from being influenced by knowledge conveyed to it by the court as to the court's opinion of the evidence submitted. *State v. Lord*, 117 Wn.2d 829, 862, 822 P.2d 177 (1991), *abrogated on other grounds by State v. Schierman*, 415 P.3d 106 (2018). Emanuel Hubbart relies on *State v. Jackman*, 156 Wn.2d 736, 132 P.3d 136 (2006), for support. In *Jackman*, the State proposed, and the trial court adopted without objection from the defendant, jury

instructions which designated the victims by their initials and included the victims' birth dates. The instructions read, in part: "[t]hat on or about June 1, 2002, through October 9, 2002, the defendant aided, invited, employed, authorized or caused B.L.E., DOB 04/21/1985 to engage in sexually explicit conduct." *State v. Jackman*, 156 Wn.2d at 740 n.3.

We distinguish *Jackman*. In *Jackman*, the jury instructions included the victim's date of birth, whereas in Emanuel Hubbart's trial, a properly admitted exhibit included Kathy's date of birth. The trial court's instructions to the jury did not list Kathy's date of birth.

Emanuel Hubbart forwards no decision, in which the court held that an exhibit constitutes a judicial comment on the evidence. Also, Hubbart never disputed Kathy's date of birth. Therefore, we decline to entertain Hubbart's assignment of error. Hubbart does not show any error to be palpable, and he fails to demonstrate any prejudice.

Prosecutorial Misconduct—Vouching

Next, Emanuel Hubbart claims the prosecutor improperly vouched for Kathy's honesty because the State told jurors that Kathy "had no interest but the truth" and "had no motive to fabricate" during closing argument. Appellant's Br. at 12. Emanuel also contends that the State, without any evidentiary support, claimed Kathy was credible because she could have refused to cooperate with the prosecution. Finally, if this court rules that trial counsel did not preserve the prosecutor's statements as misconduct,

14

Hubbart argues that his counsel performed ineffectively by failing to object to the arguments. We disagree that the prosecution committed misconduct and thus do not address Hubbart's last contention.

To prevail on a claim of prosecutorial misconduct, Emanuel Hubbart must establish that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial. *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008). Once a defendant establishes that a prosecutor's statements are improper, the reviewing court determines whether the defendant was prejudiced under one of two standards of review. *State v. Emery*, 174 Wn.2d at 760 (2012). If the defendant objected, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. *State v. Emery*, 174 Wn.2d at 760. The failure to object to an improper remark constitutes a waiver of error unless the remark is so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury. *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011).

Improper vouching occurs when the prosecutor expresses a personal belief in the veracity of a witness or indicates that evidence not presented at trial supports the testimony of a witness. *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). Whether a witness testifies truthfully is an issue entirely within the province of the trier of fact. *State v. Ish*, 170 Wn.2d at 196. Prosecutors may argue an inference from evidence and

15

prejudicial error will not be found unless the prosecutor unmistakably expressed a personal opinion. *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995).

During closing, the State, in Emanuel Hubbart's prosecution, never expressed a personal belief as to Kathy's veracity. The prosecution instead shared with the jury those circumstances under which, and the reasons for which, the jury should believe Kathy's testimony to be the truth. Because of Hubbart's attack on Kathy's credibility, the prosecution's comments were appropriate, if not critical.

Emanuel Hubbart also argues that the evidence did not support the prosecution's comments that Kathy told a consistent story for twenty years and that she could have refused to cooperate with law enforcement. We find ample evidence that Kathy always told an accurate story beginning with the first report of Emanuel Hubbart's conduct in 2003. Also, we observe that her natural father prompted the reopening of the investigation and Kathy could then have refused to cooperate with law enforcement.

Prosecutorial Misconduct—Search for Truth

Emanuel Hubbart argues that the State impermissibly suggested the trial was a search for truth and justice. We agree that any such argument by the prosecution would be misconduct. A jury's job is not to declare the truth or determine the truth of what happened. *State v. Emery*, 174 Wn.2d at 760 (2012). Nevertheless, the State never told the jury that its role included a search for truth. Instead, the prosecution responded to Hubbart's attack on Kathy's integrity and credibility and the trial's underlying question

16

No. 35111-4-III
*State v. Hubbart*

of why the trial occurred fourteen years after reports of the abuse. The prosecution

explained that Kathy underwent years of others disbelieving her and endured the trauma

of a reinvestigation and trial as part of her search for the truth. When the prosecution

referred to a search for justice and truth, the prosecution always commented within the

context of Kathy's search, never in the context of any jury duty.

CONCLUSION

We affirm the convictions of Emanuel Hubbart.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, J.

_____
Lawrence-Berrey, C.J.

17